ARUNDEL CORPORATION *v.* JASPER

[No. 199, September Term, 1958.]

*Decided April 15, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*William C. Holland,* for appellant.

*I. Duke Avnet,* with whom were *Avnet & Avnet* and *Martin Moncarz* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

This is an appeal from a judgment entered by the Superior Court of Baltimore City on the verdict of a jury in favor of Frank W. Jasper (Jasper or employee) against the Arundel Corporation (Arundel or employer). The action involved an injury sustained by Jasper from a fall on board a dredge belonging to Arundel. The suit was brought under the provisions of 46 U. S. C. A., § 688, usually referred to as the Jones Act. The first count alleged negligence under the Jones Act. The second charged unseaworthiness under the general maritime law.

On July 29, 1957, the employee was working as an oiler on the dredge *Governor Herrick.* The employee—because he disregarded the old sea adage: "One hand for the ship and one for yourself," which he probably had never heard of—was injured when a loose and slippery step of a ladder tilted while he was descending to the lower engine room, causing him to fall to the deck below and injure his back. There was evidence from which a jury could find that the employer was negligent in allowing the ladder to remain in a dangerous condition.

The *Governor Herrick* was a non-registered, non-self-propelled dredge, approximately 132 feet long and 52 feet wide, with a 12-foot draft at the bow, and a 10-foot 6-inch draft at the stern. It contained steam-driven machinery for the purpose of operating the dredging bucket and equipment. It depended on tugboats for all travel except when the bucket was touching bottom, when, by exerting pressure on the bottom

through the boom, it could "creep" a few feet and change its position. However, in over 57 feet of water the dredge could not reach bottom either to work or to move to a new position. The dredge had been built in Massachusetts in 1912. Its home port was New York City. It was towed to Baltimore in 1955. During the course of the trip down the coast, the dredge carried only a skeleton crew to keep up the steam to man the pumps and maintain the dredging machinery. After its arrival in Baltimore it had engaged in maintaining ship channels in the harbor prior to mid-July 1957.

On July 15, 1957, the dredge commenced work on the Baltimore Harbor Tunnel Project and was thus engaged on July 29, 1957, the date of the accident. At that time the dredge was digging backfill sand off of Wagner's Point for use in covering the newly laid tubes of the tunnel. The dredge would transfer the silt or sand dug from the bottom to scows which would dump the material on the tubes. While so engaged, the dredge was approximately 600 feet from shore in about 14 feet of water.

The employee was employed on 8-hour shifts. He lived at his home in Baltimore and traveled each day to the dredge by means of a crewboat. He never slept on the dredge although there were quarters on board for the crew. He would eat at the crew's mess when a mealtime occurred during the course of his shift but he paid for such meals. He had worked for the employer for approximately eighteen months prior to the accident. Originally a handyman, he had engaged in substituting for deckhands who were off duty, but after a layoff, he began working as an oiler on the *Governor Herrick* as well as the dredge *Maryland*. During the entire period he had worked only in Baltimore Harbor. Prior to then he had been a truck driver and had never worked on the water. He did not have seaman's papers. His duties as an oiler consisted of oiling the dredging machinery in the engine room. He took his orders from the chief engineer. If the dredge were to be moved to another location outside Baltimore, he could accompany it as part of the skeleton crew which was usually drawn from the older, more experienced

crew members. His duties, then, would be merely to help keep the steam up for the pumps.

Title 46 U. S. C. A., § 688 [the Jones Act] provides in part:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply * * *."

A seaman may institute an action under the Jones Act in a state court for the negligence of his employer resulting in personal injury. If he does, he would have a right of trial by jury, and all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees apply as if suit had been brought in a Federal court. The seaman has the burden of proving negligence, but—since the doctrine of comparative negligence is applicable—his contributory negligence would only subject him to a reduction of the damages allowed in proportion to the amount of the negligence attributable to him. The seaman is also excused from any assumption of risk. *Curtis Bay Towing Co. v. Dean,* 174 Md. 498, 199 A. 521 (1938); *Farrell Lines, Inc. v. Devlin,* 211 Md. 404, 127 A. 2d 640 (1956).

The employer contends that the employee was not a seaman within the purview of the Jones Act, and that his remedy is limited to the Longshoremen's and Harborworkers' Compensation Act [33 U. S. C. A., §§ 901-950]. In 1926, the Supreme Court in *International Stevedoring Co. v. Haverty,* 272 U. S. 50 (1926), held that a longshoreman in the employ of a stevedoring company was a seaman and was entitled to recover under the Jones Act, since the work performed by such men was a maritime service formerly performed by a ship's crew. However, in 1927, the Longshoremen's and Harborworkers' Compensation Act was enacted. This act specifically excluded the "master or member of a crew" of a

vessel. 33 U. S. C. A., § 903 (a) (1). Thus, this act restricts and limits the scope of the Jones Act, by means of negative implications, to seamen who are also either masters or members of a crew of a vessel. See *South Chicago Co. v. Bassett*, 309 U. S. 251 (1940); *Carumbo v. Cape Cod S. S. Co.*, 123 F. 2d 991 (C. A. 1st Cir., 1941). In these and in subsequent cases the courts developed three tests to determine whether a seaman was to be entitled to the benefits of the Jones Act: (i) that there be a vessel in navigation; (ii) that there be some more or less permanent connection with that vessel; and (iii) that the employee be aboard primarily to aid in navigation. *Carumbo v. Cape Cod S. S. Co., supra; Wilkes v. Mississippi River Sand & Gravel Co.*, 202 F. 2d 383 (C. A. 6th Cir., 1953), *certiorari* denied, 346 U. S. 817 (1953); *Nelson v. Greene Line Steamers*, 255 F. 2d 31 (C. A. 6th Cir., 1958), *certiorari* denied, 358 U. S. 867 (1958).

The *Bassett* case, *supra,* stated that whether or not an employee is "a member of a crew" turns on questions of facts and that, if a finding on this question has evidence to support it, the finding is conclusive. This decision, however, appears to have been temporarily narrowed by the Supreme Court in *Swanson v. Marra Bros., Inc.*, 328 U. S. 1 (1946), which upheld the dismissal of a longshoreman's complaint by stating that recovery is available under the Jones Act only "to the members of the crew of a vessel plying in navigable waters," and in *Desper v. Starved Rock Ferry Co.*, 342 U. S. 187 (1952), where it was held that a petitioner was not a seaman despite the finding of the jury in the District Court that he was in that category.

Nevertheless, in *Summerlin v. Massman Const. Co.*, 199 F. 2d 715 (C. A. 4th Cir., 1952), where the facts were quite similar to the facts in the instant case, Judge Soper for the Court, ruled that a fireman on a floating derrick anchored in the York River and pouring concrete into forms incident to building a bridge across the river could be considered to be a seaman under the Jones Act. In the *Summerlin* case the floating derrick—which had no sleeping quarters for the crew members—had to be moved in the water from time to time

to facilitate the construction of the bridge since it had no motive power of its own. The District Court, at a hearing on the pleadings under a stipulated statement of facts, found that the injured fireman *was not* a seaman or a crew member of a vessel engaged in navigation on navigable waters. But the Circuit Court reversed and remanded the case because it found the exact opposite.

And in *Texas Company v. Gianfala,* 222 F. 2d 382 (C. A. 5th Cir., 1955), the decedent was a boilerman working aboard a submersible drilling barge which was resting on the bottom of a bay. The barge was moved from one location to another about once a year. The duties of the decedent consisted of firing the boilers and, in the event that the barge was moved, of opening the valves that raised it. The facts were uncontroverted. The jury returned a verdict for the widow of the decedent. The Court of Appeals of the Fifth Circuit reversed, holding that the evidence was insufficient to justify such a finding in that the decedent was a member of a drilling crew and not a member of a ship's crew. The Court also held that the vessel was not in navigation. The Supreme Court reversed the Fifth Circuit in a memorandum opinion [*Gianfala v. Texas Company,* 350 U. S. 879 (1955), *rehearing* denied 350 U. S. 960 (1956)], although the facts were uncontroverted. In so doing, the Supreme Court cited the *Bassett* case, *supra,* the *Summerlin* case, *supra,* the *Wilkes* case, *supra,* and the *Gahagan* case, *infra.*

The Supreme Court, however, removed any doubt as to its position in this area in *Senko v. LaCrosse Dredging Corp.,* 352 U. S. 370 (1957). In that case the petitioner was employed as a handyman to assist in dredging operations in a slough dug to by-pass a rocky section of the Mississippi River. The dredge was never moved during the course of the petitioner's employment, although it was moved from time to time as the work progressed. The petitioner was a member of the Common Laborers' Union which sent him to the defendant dredging company as a laborer. His duties entailed carrying supplies from the shore to the dredge, cleaning up the dredge, filling the water cooler, cleaning the lights and placing them when the construction work continued at night, and taking

soundings to measure the amount of silt pumped from the slough. He lived at home and worked an eight-hour shift. He was injured by the explosion of a coal stove while he was placing signal lanterns from the dredge on the river bank. The jury returned a verdict for the petitioner, but this was set aside by the Illinois Appellate Court on the ground that there was insufficient evidence to support a finding that he was a "member of the crew." The Supreme Court reversed stating that the decision of a jury is final if it has a reasonable basis, whether or not an appellate court agrees with the estimate of the jury. The Supreme Court stated at page 372:

> "It is true that the dredge was anchored to the shore at the time of petitioner's injury and during all the time petitioner worked for respondent. It is also true that this dredge, like most dredges, was not frequently in transit. We believe, however, that there is sufficient evidence in the record for the jury to decide that petitioner was permanently attached to and employed by the dredge as a member of its crew."

After stating that a jury could reasonably have believed that the petitioner would have the responsibilities of a deck hand in the event that the dredge were moved, the Court stated at page 374:

> "We believe, however, that our decision in *South Chicago Co. v. Bassett, supra,* has not been fully understood. Our holding there that the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact meant that juries have the same discretion they have in finding negligence or any other fact. The essence of this discretion is that a jury's decision is final if it has a reasonable basis, whether or not the appellate court agrees with the jury's estimate.
>
> "Because there was testimony introduced by petitioner tending to show that he was employed al-

most solely on the dredge, that his duty was primarily to maintain the dredge during its anchorage and for its future trips, and that he would have a significant navigational function when the dredge was put in transit, we hold there was sufficient evidence in the record to support the finding that petitioner was a member of the dredge's crew."

In the next term, the Supreme Court decided two more cases in this area. In *Grimes v. Raymond Concrete Pile Co.*, 356 U. S. 252 (1958), the petitioner sought damages for injuries suffered while being transferred at sea in a Navy life ring from a tugboat to a "Texas Tower" which the respondents were constructing under a Government contract. The petitioner lived on the tower and kept it in condition by operating air compressors, generators and pumps. The District Court directed a verdict for the respondents, indicating its view that the evidence created a fact question on the issue as to whether the petitioner was a crew member, but holding that the petitioner's exclusive remedy was under the Defense Bases Act [42 U. S. C. A., §§ 1651-1654]. The Circuit Court held that the Defense Bases Act did not provide an exclusive remedy, but affirmed the District Court on the ground that the evidence was not sufficient to create a factual question as to whether the petitioner was a crew member. The Supreme Court remanded the case holding that the petitioner's evidence presented an evidentiary basis for a finding by a jury as to whether or not the petitioner was a member of the crew of a vessel.

In *Butler v. Whiteman*, 356 U. S. 271 (1958), the decedent was employed as a laborer doing odd jobs around the wharf of the respondent. The employee disappeared after being last seen running between a barge and the tug. On the morning of the accident he had been engaged in cleaning the boiler. For some months before the accident the tug had been withdrawn from navigation because it was inoperable. During the entire year the tug had neither captain nor crew and reported no earnings. At the time of the accident the tug was undergoing rehabilitation preparatory to a Coast

528

Guard inspection. In a short per curiam opinion the Supreme Court held that there was an evidentiary basis for the jury's findings as to (i) whether or not the tug was in navigation; (ii) whether or not the petitioner's decedent was a seaman and member of the crew of the tug within the meaning of the Jones Act; and (iii) whether or not the employer's negligence played a part in producing the decedent's death.

There has been much speculation as to whether all three tests hereinbefore referred to are still required in order to decide whether a petitioner can recover under the Jones Act after the *Senko* decision. See Gisevius and Leppert, *Modern Maritime Workers,* 9 Loyola L. Rev. 1 (1958). See also the subtopic entitled "The Elusive 'Crew Member'" of the comment entitled "Injured Harborworkers," 67 Yale L. J. 1205, 1229 (1958). At least one case seems to have decided to ignore the former requirements that there be a vessel in navigation and that the worker be aboard primarily to aid in navigation, and states that the real test is whether the claimant is more or less permanently employed aboard the vessel in a capacity which contributes to the accomplishment of her mission. *Perez v. Marine Transport Lines,* 160 F. Supp. 853 (E. D. La., 1958). Other cases, in form at least, seem to rely on all of the requirements, but leave the determination as to whether the petitioner had fulfilled them to the trier of the facts. *Brannan v. Great Lakes Dredge & Dock Co.,* 91 N. W. 2d 166 (Minn., 1958); *Nelson v. Greene Line Steamers, supra.* We agree that the three requirements should be considered by the jury. What tests shall be applied is a matter of Federal law.

In the case now before us the employee fulfilled the tests sufficiently to enable the jury to find that he could recover under the Jones Act. The dredge was in navigable waters in Baltimore Harbor, even though it was outside the shipping lanes at the time of the accident, and was engaged in supplying fill for the tunnel which had been constructed under the ship channels in the harbor. Cf. *Senko v. LaCrosse Dredging Corp., supra.* The employee, who was a regular worker on the dredge and had been for eighteen months, had a per-

manent connection with the dredge. And he was playing a part in the operation and welfare of the dredge. This last requirement does not mean that he must be one who can "hand, reef and steer," but applies to all of the employees aboard a ship whose duties contribute to the operation and welfare of the vessel, including cooks, bartenders, musicians, clerks and oilers. See *Wilkes v. Mississippi River Sand & Gravel Co., supra; Perez v. Marine Transport Lines, supra.*

In addition to claiming that the trial court erred in its instructions to the jury with reference to the past and future activities of the dredge and the possibility that Jasper might be employed at other times and places, hereinbefore alluded to and sufficiently answered [*Senko v. LaCrosse Dredging Corp., supra*], Arundel also contends that the trial court did not properly state the requirements of the law with respect to recovery under the Jones Act. It is true that the instructions did overemphasize what was necessary to support a finding of negligence on the part of the employer, a fact of which there appears to have been ample proof and was virtually undisputed. It is likewise true that the instructions with respect to the tests that must be met in order to prove that the employee was a seaman or a member of a crew were stated in a somewhat haphazard fashion. There is also no doubt that it would have been better had the court set out the essential requirements in a more logical and methodical sequence, but we have often ruled that a trial judge should not be "put in a strait jacket" with respect to jury instructions. If such instructions "fully and comprehensively" cover the question or point of law involved that is sufficient. *Casey v. Roman Catholic Arch.*, 217 Md. 595, 612, 143 A. 2d 627 (1958), and the cases therein cited. Moreover, in the present case, we cannot overlook the fact that the trial judge was required to instruct the jury on points or questions of law, which, it is apparent, are not yet finally and completely clarified and settled.

In reviewing the instructions, we find that the essential requirements were included therein. The court instructed the jury that it must find whether the dredge "was a vessel engaged in work on navigable waters." Later, the jury was

advised that it would "have to find out what the facts are concerning this man being a member of the crew and was he acting at that time upon navigable waters," and then informed it that the Patapsco River was a navigable body of water. Still later, he properly instructed the jury that it should find "that the employees on the * * * dredge were more or less permanently attached to her and assisted in her operation while in a stationary position and could be called upon to assist when the dredge would be towed from one point to another in navigable waters," in order to find that Jasper was entitled to recover under the Jones Act. It is apparent that this last part of the instructions adequately stated the requirement that Jasper be aboard primarily in aid of navigation as the decisions clearly state. See *Gahagan Const. Corp. v. Armas,* 165 F. 2d 301, 305 (C. A. 1st Cir., 1948), *certiorari* denied, 333 U. S. 876 (1948); *Senko v. LaCrosse Dredging Co., supra.* Although the instructions were not copious they were not inadequate and they were properly stated.

Finally, there is no merit in Arundel's third contention that the admission of hearsay evidence—consisting of the somewhat humorous exchange of quips between the chief engineer and the company doctor—had prejudicially affected the amount of the verdict. During the course of the trial Jasper testified that when he was released by the company doctor he was told to report for work. He promptly telephoned the engineer and told him that he was ready to come back to work though he was still wearing a corset. The engineer informed him that the company was "not running a convalescent home." When the employee returned to the doctor and told him what the engineer had said, the doctor advised him to tell the engineer that he was "not running a workshop * * * either." This "relayed" colloquy between two of the employees of the company instead of being inadmissible hearsay testimony was in fact admissible as "verbal acts." See *Bowie v. Martin,* 199 Md. 58, 64, 85 A. 2d 786 (1952). Since it is assumed that the person who answers a call at his place of business is the person he purports to be, the telephone conversation of the employee, who made the call, was admissible.

See *Rowan v. State,* 175 Md. 547, 558, 3 A. 2d 753 (1939); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 69 A. 405 (1908). These verbal acts did no more than show that the employee had tried to mitigate his damages by showing that the reason why he had not returned to work sooner. The admission of the testimony was not reversible error.

The judgment will be affirmed.

*Judgment affirmed, the costs to be paid by the appellant.*